IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| MARTIN JOHN NICHOLAS, | ) | Case No. 3:20-CV-00578 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES R. KNEPP, II |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF | ) | THOMAS M. PARKER |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

**I.     Introduction**

Plaintiff, Martin John Nicholas, seeks judicial review of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).  Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Court affirm the Commissioner's final decision denying Nicholas's application for DIB.

**II.    Procedural History**

Nicholas filed for DIB on December 19, 2018.  (Tr. 178).[1]  He alleged that he became disabled on June 10, 2016 due to PTSD and Tinnitus.  (Tr. 178, 223).  The Social Security Administration denied Nicholas's application initially and on reconsideration.  (Tr. 94, 79).  Nicholas requested an administrative hearing.  (Tr. 107).  ALJ Gabrielle R. Vitellio heard Nicholas's case and denied the claim in a January 13, 2020, decision.  (Tr. 16-28).  On January 28,

---

[1] The administrative transcript is in ECF Doc. 11.

2020, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3). On March 17, 2020, Nicholas filed a complaint challenging the Commissioner's decision. ECF Doc. 1.

**III.  Evidence**

    **A.  Relevant Medical Evidence**

Nicholas served several tours of duty in Afghanistan and Iraq in the U.S. Army. After an honorable discharge, Nicholas experienced problems upon his return to the United States. Nicholas began individual therapy through the VA in Toledo on October 11, 2016. Nicholas saw Kurt Bush, a readjustment counselor. (Tr. 357-364). Nicholas participated in bi-weekly individual therapy sessions from October 2016 through 2017. (Tr. 384-409). On January 5, 2017, Mr. Bush noted that Nicholas presented with symptoms consistent with PTSD and cluster A personality disorders. (Tr. 408). In May 2017, Mr. Bush also noted symptoms of anxiety. (Tr. 403).

On June 20, 2017, Nicholas underwent an initial psychiatric evaluation. (Tr. 535). He reported that he was not working and that he sometimes felt depressed about his situation. He also reported feelings of anger and rage. But he had recently discovered his creative side, which helped alleviate his feelings of worthlessness. He was interested in a film career. (Tr. 536). Nicholas reported intrusive memories from his combat history, but denied nightmares, hypervigilance or other PTSD symptoms. (Tr. 537). Julia H. Halm, M.D., diagnosed adjustment disorder with mixed emotional features, PTSD through service connection and rule-out alcohol use disorder. Nicholas declined medication but was interested in continuing individual therapy. (Tr. 537).

On December 4, 2017, Nicholas met with psychologist, Carissa Wott. He reported that he continued to struggle with depression and anxiety. Dr. Wott observed that Nicholas was well

2

oriented, appropriately dressed and groomed, and cooperative with adequate eye contact. He had normal speech and psychomotor activity; a euthymic but moderately anxious mood, with an expressive congruent affect. His thought process was goal oriented; he had relevant thought content and adequate insight and judgment. He did not report experiencing hallucinations or suicidal/homicidal ideations. (Tr. 478).

On March 22, 2018, Nicholas reported hearing auditory hallucinations. He had created different voices, one helpful and serious, one helpful and comical, one passive voice that was rarely heard, and one angry one that was negative. Mr. Bush noted that Nicholas's symptoms were consistent with a stressor disorder, cluster A personality with perhaps schizotypal personality disorder. (Tr. 386).

On March 29, 2018, Nicholas met with Jill M. Harrison, LISW, to coordinate his mental health care. He reported an increase in his symptoms, stated that he had been having auditory hallucinations and expressed interest in medication intervention. (Tr. 476). Ms. Harrison observed that Nicholas was well oriented with normal speech, an anxious mood and congruent affect, logical and coherent thought processes, no difficulty with focus or concentration, no active hallucinations or delusions and fair insight. (Tr. 477).

On April 16, 2018, Nicholas reported to Dr. Halm that he mostly stayed at home, writing a book. He also reported watching movies, playing video games, reading books and spending time with his girlfriend on the weekends. (Tr. 467). There was no evidence of auditory or visual hallucinations, paranoia, or panic attacks. Dr. Halm observed that Nicholas was appropriately dressed for the weather; his speech was normal; his mood was depressed; he was fully oriented and cognitively intact; his recent and remote memory were intact; his fund of knowledge was adequate; and his insight and judgment were fair. (Tr. 468). Dr. Halm prescribed Zoloft. (Tr. 469).

3

On April 24, 2018, Nicholas told his case manager he was worried about starting Zoloft due to negative side-effects of prior medication. His case manager educated him on the possible side effects and how to monitor them during a trial dose period. Nicholas indicated he was going to start taking half of the recommended dosage. His case manager also referred him to a creative expression group at the Thomas Wernert Center. (Tr. 461-462).

On May 22, 2018, Nicholas reported that he continued to have difficulty with anxiety and depression but had not taken his prescribed Zoloft due to concerns about side effects. (Tr. 460). He said he had been enjoying attending a writing group and hoped to form some friendships. (Tr. 460). He had also started exercising in the mornings, which he found to be helpful. (Tr. 460).

Nicholas attended group therapy on July 12, 2018 but did not continue because it was not "a good fit" for him. (Tr. 451). He continued to decline medication. He felt that he had a talent for writing short stories but could not identify any employment opportunities doing that. He was open to doing volunteer work. Ms. Harrison observed that Nicholas was well oriented with normal speech; an anxious mood with congruent affect; logical and coherent thought processes; no difficulties with focus or concentration; normal thought content; denied delusions and hallucinations; and fair insight. (Tr. 452).

On September 26, 2018, Nicholas reported that he continued to feel depressed and anxious, but, after attending an out of town wedding the previous week, had noticed an improvement in his symptoms. He continued to decline medication but was amenable to meeting with a peer support specialist to focus on recovery techniques. Ms. Harris observed that Nicholas was well oriented with normal speech; had an anxious mood and congruent affect; logical and coherent thought processes; no difficulties with focus or concentration; normal thought content; and denied delusions or hallucinations. (Tr. 447).

4

On November 2, 2018, Nicholas reported that he spoke at a local film/actors group that he had attended and received positive feedback from his peers. He denied the need for further psychiatric intervention and had been coping with his depression by focusing on his goals. (Tr. 430-431).

On November 28, 2018, Nicholas reported that he had attended five sessions with a peer support specialist, which he found to be helpful. He continued to decline medication but reported that his mood had improved since he started taking over-the-counter herbal supplements. He continued to go the gym but felt that he was spending too much time at home. He stated he was thinking about attending film school. (Tr. 426). Observations regarding his mental status were similar to prior sessions; he had an anxious mood. (Tr. 427).

In January 2019, Nicholas reported that he had enrolled in film school at Bowling Green State University. (Tr. 425). On February 15, 2019, he reported that he had started school and that it was going well. He stated that he continued to struggle with making connections with others, but his girlfriend was supportive. Mental examination showed that he was well oriented with normal speech; had an anxious mood and congruent affect; normal focus and concentration; normal thought content; and denied delusions and hallucinations. (Tr. 564).

On June 10, 2019, Nicholas reported that he continued to be depressed and anxious but did not want to take medication for fear of side-effects. He still attended school, but reported continuing difficulty talking with others. (Tr. 550). Mental status examination showed that Nicholas's behavior and appearance were normal, apart from some intense eye contact at times; his speech was normal; his mood was depressed and his affect was flat; he had no perceptual disturbances; his thought process and content were normal; he was fully oriented and cognitively intact; his recent and remote memory were intact; his fund of knowledge was adequate; and his insight and judgment were fair. (Tr. 551).

5

On September 9, 2019, Nicholas reported continued difficulty making friends at school and low energy. He continued to decline medication. He was living with his girlfriend, which helped with his social skills. His mental status examination was unremarkable apart from a depressed/anxious mood and flat affect. (Tr. 517-519). On September 18, 2019, Nicholas reported that he was doing "alright" and had recently finished a pre-edit on a movie he was making. He agreed that he did not require additional peer-support follow up but stated he would call to make an appointment if he felt it was needed in the future. (Tr. 516).

On November 12, 2019, Nicholas established treatment with the VA in Ann Arbor. (Tr. 572). His initial psychiatry evaluation noted that he had been rated with a 100% service-connected disability due to PTSD. Nicholas reported continued depression and anxiety and stated that he was not interested in medication due to fear of unpleasant side effects. (Tr. 573). He also reported problems with irritability and connecting with others. (Tr. 574).

### B. Relevant Opinion Evidence - State Agency Psychologists

On February 14, 2019, state agency reviewing consultant, Courtney Zeune, Psy.D. reviewed Nicholas's mental health records and found that he had mild limitations in understanding, remembering, and applying information; moderate limitations in interacting with others; moderate limitations in concentration, persistence, or pace; and moderate limitations in adapting or managing oneself. (Tr. 71). Dr. Zeune opined that Nicholas would be able to perform one to three step tasks in a routine work environment with only superficial contact with others and infrequent changes in the work routine that could be readily explained. (Tr. 73-75). On April 17, 2019, state agency reviewing consultant, Cyndi Matyi, Ph.D., reviewed Nicholas's mental health records and affirmed Dr. Zeune's opinions. (Tr. 85-86, 88-89).

6

C.     Relevant Testimonial Evidence

Nicholas testified at the ALJ's hearing. (Tr. 37-59). Nicholas stated he was 38 years old. (Tr. 37). He had lived with his girlfriend for three years. (Tr. 58). He had previously served in the army and was honorably discharged. Following his service, he worked as a secretary for the U.S. Department of Agriculture/Internal Revenue Service from 2011 to 2016. (Tr. 52, 54, 58). In that job, he was required to open mail and process cases. He occasionally lifted boxes between 30 and 50 pounds. (Tr. 52-53).

Nicholas testified that his disability began in June 2016 when he became overwhelmed at work. Nicholas stated that he had been working with people who did not understand his disabilities and were "setting him up for failure." (Tr. 40, 53). He was reprimanded "constantly." (Tr. 45, 54). He quit his job due to his anger and rage. (Tr. 40). Since then, he had been treating with doctors and seeing a counselor once or twice a month. (Tr. 41).

Nicholas testified that he could no longer work because he had difficulty working with people and understanding people. He stated that he had panic attacks that could be brought on by a cup of coffee. His panic attacks occurred approximately once a month or every other month. (Tr. 42). To alleviate them, he would use breathing techniques, go for a walk or call a friend. (Tr. 42). Nicholas also had severe, daily depression. (Tr. 46-47). Over the past six months, his panic attacks had improved, but his depression had worsened. (Tr. 49). Nicholas was not on any medication because he had previously had a negative experience with severe withdrawal symptoms after taking Trazodone. (Tr. 44-45).

On a typical day, Nicholas would go for a walk or have coffee. He would read books, play video games or watch T.V. He talked to himself a lot, trying to deal with all the anger, confusion and anxiety. (Tr. 46). Nicholas was able to drive, but he would get nervous about getting in an accident or that other drivers would get angry with him. Nicholas slept well, but once or twice a

7

week he would wake up several times and would have difficulty going back to sleep. On those days, he would take naps during the day or have low energy. (Tr. 44).

Nicholas was attending school full time, but he did not talk to anyone at school due to social anxiety. (Tr. 43, 46, 50). He had missed six classes and was failing a class. (Tr. 43). He also had days when he wanted to leave classes early – and had done so once or twice. (Tr. 48). He felt that attending school was different than working because he was not expected to perform at school and could be more passive. (Tr. 43). Nicholas testified that his ability to concentrate and focus was very poor. He had difficulty following instructions and missed things that other students were able to pick up. (Tr. 45).

Vocational Expert ("VE") Lisa Gagliano also testified at the hearing. (Tr. 59-64). She considered Nicholas's prior work to be that of an administrative clerk, which was at the light exertional level, but Nicholas had performed it at the medium exertion level. (Tr. 60). The VE testified that an individual who had at least a high school education and could perform medium work with no dangerous machinery; could understand and carry out simple instructions; could not do assembly line production dictated by an external source; could not interact with the public; and could occasionally interact with co-workers and supervisors, would be able to work as a laundry laborer, a janitor and a kitchen helper. There were significant numbers of these jobs in the national economy. (Tr. 60-61).

The individual would not be able to perform any jobs if he were limited to no interaction with co-workers. (Tr. 61-62). The individual would be required to be on task at least 90% of the workday, excluding normal scheduled work breaks. Finally, if the individual missed more than eight days of work in a twelve-month period, he would not be able to maintain any employment. (Tr. 63).

8

**IV.	The ALJ Decision**

The ALJ made the following paraphrased findings relevant to this appeal:

3. Nicholas had the severe impairments of posttraumatic stress disorder (PTSD) and depression. (Tr. 18).

4. Nicholas did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 19).

5. Nicholas had the residual functional capacity to perform medium work except he could not work in an environment with dangerous machinery; he could not do assembly line production work dictated by an external source, he could not interact with the public; and could only occasionally interact with co-workers and supervisors. (Tr. 20).

10. Considering his age, education, work experience, and residual functional capacity, there were jobs existing in significant numbers in the national economy that Nicholas could perform. (Tr. 27).

Based on all of her findings, the ALJ determined that Nicholas had not been under a disability from June 10, 2016 through the date of her decision. (Tr. 28).

**V.	Law & Analysis**

 **A.	Standard of Review**

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "Substantial evidence" is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, No. 19-2441, 2020 U.S. App. LEXIS 25007, at *15, ___ F. App'x ___ (6th Cir. Aug 7,

9

2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)). Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones*, 336 F.3d at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets this low standard for evidentiary support. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783 ("It is not our role to try the case de novo." (quotation omitted)). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)).

  Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No.

10

2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. §§ 404.1512(a), 416.912(a).

### B. Step Two – Severe Impairments

Nicholas argues that the ALJ erred at Step Two by failing to consider (as either severe or non-severe) his diagnosed mental health conditions of adjustment disorder with mixed emotional features, obsessive-compulsive disorder, social anxiety disorder and generalized anxiety disorder. ECF Doc. 12 at 12-13. At the second step of the sequential analysis, the ALJ determines whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(a)(4)(ii), (c). A "severe impairment" is a medically determinable condition that: (1) has more than a minimal effect on an individual's ability to perform physical or mental work; and (2) is "expected to result in death [or]

11

to last for a continuous period of at least 12 months." 20 C.F.R. §§ 404.1509, 404.1522; *see Salmi v. Sec'y of Health & Human Servs.*, 744 F.2d 685, 691 (6th Cir. 1985) ("'An impairment can be considered as non-severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work.'" (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984))). If the claimant does not have a severe impairment, or combination of impairments, the regulations direct the ALJ to find that the claimant is not disabled. 20 C.F.R. §§ 404.1520(c).

Step Two is a threshold inquiry "intended to 'screen out totally groundless claims.'" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (6th Cir. 2009) (quoting *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985)). "After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" *Nejat*, 359 F. App'x at 577 (quoting SSR 96-8p, 1996 SSR LEXIS 5 (Jul. 2, 1996)). So long as the ALJ considers all the claimant's impairments – severe and non-severe – in the remaining steps of the disability determination, any error at Step Two is harmless. *Nejat*, 359 F. App'x at 577 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

Nicholas cites medical records that reflect his various diagnosed mental health impairments such as OCD and social anxiety disorders and argues that the ALJ should have found that these were severe impairments. ECF Doc. 12 at 12. At Step Two, the ALJ found only PTSD and depression to be severe impairments. I find that any alleged failure to find additional severe impairments was harmless, because the ALJ stated that she considered all of Nicholas's mental impairments and their symptoms at later steps in the sequential analysis. *Nejat*, 359 F. App'x at 577 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

12

For example, at Step Three, the ALJ stated that she had considered all of Nicholas's symptoms. (Tr. 20). She specifically discussed his panic attacks and the functional limitations they caused. (Tr. 21). The ALJ also stated that the medical records documented an adjustment disorder and anxiety symptoms. (Tr. 22-24). And, at Step Four, the ALJ incorporated limitations in Nicholas's RFC for the functional limitations caused by all of his mental impairments and limitations. (Tr. 25, 27). These statements are evidence that the ALJ did what was required: she considered all of Nicholas's impairments, sever and non-severe.

Nicholas has not shown that he suffered harm at later steps of the sequential analysis as a result of the ALJ's failure to find additional severe mental health impairments (ECF Doc. 12 at 13), nor is any harm apparent. Because the ALJ actually considered all of Nicholas's symptoms and the various diagnosed mental health impairments (Tr. 19-26), even if the ALJ erred by not expressly finding additional severe mental health impairments at Step Two, such error was harmless, and her decision should not be reversed or remanded on that basis.

### C. Step Three - Listings §§ 12.04, 12.06 and 12.15

Nicholas next argues that the ALJ erred at Step Three by not finding that he met the criteria for Listings §§12.04, 12.06 and 12.15. ECF Doc. 13-16. At Step Three, a claimant has the burden to show that he has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant meets all of the criteria of a listed impairment, he is disabled; otherwise, the evaluation proceeds to Step Four. 20 C.F.R. § 404.1520(d)-(e), 416.920(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of SSA*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing.").

13

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is impossible for a reviewing court to determine whether substantial evidence supported the decision). The ALJ "need not discuss listings that the [claimant] clearly does not meet, especially when the claimant does not raise the listing before the ALJ." *See Sheeks v. Comm'r of SSA*, 544 F. App'x 639, 641 (6th Cir. 2013). "If, however, the record raises a substantial question as to whether the claimant could qualify as disabled under a listing, the ALJ should discuss that listing." *Id.* at 641; *see also Reynolds*, 424 F. App'x at 415-16 (holding that the ALJ erred by not conducting any Step Three evaluation of the claimant's physical impairments, when the ALJ found that the claimant had the severe impairment of back pain).

"A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he satisfied a listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks*, 544 F. App'x at 641-42). "Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Id.* (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 433; *see also Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (finding harmless error when a claimant could not show that he could reasonably meet or equal a listing's criteria).

The Commissioner argues that, even if the ALJ should have considered Listings §§ 12.04 and 12.06 at Step Three of her sequential analysis, Nicholas suffered no harm by her failing to do so because he could not meet the paragraph "B" or "C" criteria for those listings, which are

14

identical to those the ALJ properly evaluated in deciding the applicability of Listing § 12.15. The Commissioner's argument is correct.

Listing § 12.04 establishes the criteria for affective disorders, Listing § 12.06 establishes the criteria for anxiety-related disorders and Listing § 12.15 establishes the criteria for trauma and stressor related disorders. 20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.00(A), 12.04(B), 12.06(B), 12.15(C). To meet the Listings' severity level for these categories of disorders, the claimant must show that he meets: (1) the impairment-specific medical criteria in paragraph A; and (2) the functional limitations criteria in paragraphs B or C. 20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.00(A).

The paragraph B and C criteria of these three listings are identical. Paragraph B requires that the claimant's disorder must result in an "extreme limitation of one or marked limitation in two, of the following areas of mental functioning:

> (1) understand, remember or apply information;
>
> (2) interact with others;
>
> (3) concentrate, persist or maintain pace;
>
> (4) adapt or manage oneself."

20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.00(A), 12.04(B), 12.06(B), 12.15(C).

Paragraph C requires a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:

> (1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [the] mental disorder; and
>
> (2) marginal adjustment, that is, [the claimant has] minimal capacity to adapt to changes in [his] environment or to demands that are not already part of [his] daily life.

20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.00(A), 12.04(B), 12.06(B), 12.15(C).

15

The ALJ applied proper legal procedures and reached a decision supported by substantial evidence in determining that Nicholas did not have an impairment or combination of impairments that met or medically equaled Listing § 12.15. The ALJ complied with the regulations by expressly discussing whether Nicholas met the paragraph B or C criteria. *Foster*, 279 F.3d at 357; *Sheeks*, 544 F. App'x at 641; *Reynolds*, 424 F. App'x at 415-16; 20 C.F.R. §§ 404.1520(a)(4)(iii). (Tr. 19-20). The ALJ adequately explained that, considering all of Nicholas's impairments singly and in combination, he did not satisfy the paragraph B criteria for Listings 12.15 because he had no difficulties in the categories of understanding, remembering, and applying information. The ALJ noted that Nicholas was attending school fulltime, reading, writing and managing his own finances and medical appointments. The ALJ found Nicholas had only moderate difficulties in the area of interacting with others. The ALJ stated that Nicholas admitted to participating in public writing and acting groups, attended college fulltime, attended appointments, lived with his girlfriends and had a few friends. (Tr. 19). The ALJ found that Nicholas had moderate difficulties in the category of concentrating, persisting, and maintaining pace. She noted that he was able to drive, attend college, attend groups, interact with his girlfriend and a few friends, perform personal care tasks, household chores and manage his finances and medical appointments. (Tr. 19). Finally, citing some of these same facts, the ALJ found that Nicholas had no limitations in the category of adapting or managing oneself. (Tr. 19-20). In arguing that he met the paragraph B criteria, Nicholas cites some of the traumatic events that occurred in his life. But he has not cited specific evidence showing that he had greater functional limitations than those found by the ALJ. Thus, Nicholas has not identified any error in the ALJ's evaluation of the paragraph B criteria.

The ALJ also adequately explained that the record did not show that Nicholas met the paragraph C requirements:

16

> Here, the record supports the claimant has a severe and persistent mental health diagnosis of PTSD, which has been treated on an intensive outpatient basis for more than 2 years. However, there is no evidence that the claimant has a minimal capacity to adapt to changes in his environment[;] in the course of the adjudication, the claimant relocated from Boston to Toledo, established with new treatment providers, joined local theatre/writing groups and therapeutic groups, and started college on a fulltime basis. (3F/19/48, 6E, 7F/19-20 and by testimony). He was able to adjust o these new activities without significant limitations and has continued in fulltime college at least through the date of the hearing. Thus, the evidence does not support that eth claimant has a minimal capacity to adapt to changes and therefore the "paragraph C" criteria are not satisfied.

(Tr. 20). Nicholas disagrees with the ALJ's evaluation of the evidence and points to his own subjective reporting of symptoms to support his argument that he met the criteria for paragraphs B and C of the Listings. ECF Doc. 13 at 19-20. But he has not shown that there was an absence of substantial evidence for the ALJ's conclusion that he did *not* meet the criteria for Paragraphs B and C of Listings § 12.15. As discussed above, even if Nicholas could successfully argue that a preponderance of the evidence supports his position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien*, 819 F. App'x at 416. I conclude that the ALJ sufficiently supported her conclusion that Nicholas did not demonstrate that he met or medically equaled Listing § 12.15

Because the Paragraph B and C criteria of Listing § 12.15 are identical to the same criteria for Listings §§ 12.04 and 12.06, the conclusion that the ALJ's sufficiently supported her finding regarding § 12.15 dictates the same negative conclusion in regard to Nicholas's ability to show he met or medically equaled the requirements for Listings §§ 12.04 and 12.06. Thus, while it would have been preferable for the ALJ to have discussed all three Listings, any error in her failure to consider the latter two was harmless. In sum, I conclude that substantial evidence supports the ALJ's decision and Nicholas has failed to identify any harmful error at Step Three of the sequential evaluation.

17

### D. Evidence Considered by the ALJ

Finally, Nicholas argues that the ALJ did not consider all of the relevant evidence when she made her decision. ECF Doc. 12 at 20-23. Specifically, he argues that the ALJ failed to consider an evaluation done by James Cartreine, Ph.D. on April 25, 2016 as part of Nicholas's disability rating through Veterans Affairs. He also argues that the ALJ should have mentioned two additional evaluations: an Autistic Spectrum Disorder evaluation conducted on September 6, 2017 and a compensation and pension evaluation by Stephanie Young, Ph.D., on June 12, 2019. ECF Doc. 12 at 20. For the most part, Nicholas has only cited his own complaints made during these evaluations. He has not explained how including a discussion of these evaluations in the ALJ's analysis would necessarily have altered her RFC finding or her finding of non-disability.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e). The RFC is an assessment of a claimant's ability to do work despite his impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5. Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5. An ALJ is required to *consider* all of the relevant evidence but is not required to discuss every piece of evidence in the administrative record so long as her opinion is supported by substantial evidence. See 20 C.F.R. § 404.1545(a)(1); *see also Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004).

Contrary to Nicholas's argument, the ALJ's decision stated that she considered all of the medical evidence and other evidence in the record. (Tr. 20-21). She was not required to

18

"mention" the evaluation done by James Cartreine, Ph.D., through the Department of Veteran's Affairs. In fact, as argued by the Commissioner, the regulations provide that decisions by other governmental agencies are not binding, and the ALJ is not expected to provide analysis about those decisions. 20 C.F.R. § 404.1504. And 20 C.F.R. § 404.1520b(c)(1) provides that decisions by other governmental agencies are "neither valuable nor persuasive to the issue of whether you are disabled, … we will not provide any analysis about how we considered such evidence in our determination." The ALJ cited these regulations and expressly stated that she had "considered all the supporting evidence underlying the VA decision that we received as evidence in this claim …" (Tr. 24).

Nicholas has not explained how mentioning Dr. Cartreine's evaluation or two additional evaluations (reflected in the medical evidence) would necessarily have led the ALJ to a different RFC finding. Nicholas likely cites these records because they document that he was reporting more severe symptoms than he did at other times in the record. But the ALJ applied the proper legal standard when she evaluated Nicholas's statements regarding the severity of his symptoms. She found that his statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely consistent with the evidence. (Tr. 22). She was not required to accept Nicholas's subjective symptom complaints at face value and was permitted to discount his statements about his symptoms if inconsistent with objective medical and other evidence. *See Jones*, 336 F.3d at 475–76; SSR 16-3p, 2016 SSR LEXIS 4 \*15 (Oct. 25, 2017) ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence.").

The ALJ's decision cited specific records showing that Nicholas had repeatedly declined medication, had been attending school on a full time basis, was able to participate in a variety of

19

social structured activities, cooked, drove, helped with household chores, exercised, read, watched TV, played video games, maintained relationships with his girlfriend and a few other friends and attended a variety of appointments. (Tr. 25). Considering these daily activities and issues, it was appropriate for the ALJ to find that Nicholas's impairments did not limit his functional abilities to the degree Nicholas alleged. Nicholas has not identified any error in the ALJ's finding that his reports regarding the severity of his symptoms were not fully supported by the other evidence in the record. Nor has he identified any error in her failure to discuss specific medical records in her decision. The ALJ was not required to discuss every piece of evidence in the administrative record.

## VI. Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Court affirm the Commissioner's final decision denying Nicholas's application for DIB.

Dated: February 3, 2021

Thomas M. Parker
United States Magistrate Judge

---

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).